May it please the court, I'm Stephanie Gelbert Moore. I represent Alaska State Troopers Brad Nelson, John Cyr, and Jorge Santiago. This case involves a police officer who reasonably responded to a threat to his safety during an officer safety pat-down search. The court's analysis on this appeal involves a two-step inquiry. First, whether the officer's conduct violated a constitutional right. And second, even if a right was violated, whether the right was clearly established at the time. My focus here is on the second step of the inquiry. What was the threat to this officer's safety? The initial threat was the pre-existing officer safety warnings that existed before the traffic stop even occurred. As he began the pat-down search... I'm sorry, what were those things? They were general officer safety warnings specific to Mr. Winterowd. Both Trooper Nelson and Trooper Cyr was familiar with them, and Trooper Nelson stated in his declaration that he received the warnings. What were they? What was the substance of the warnings? There's no information about the substance. They were just generalized safety warnings. What does that mean? I don't understand. It's sort of like danger? That's true. If you were to sort of yell danger right now, everybody would know what you're talking about? It's true that it doesn't necessarily inform the officer either the amount of danger that may be at the scene. It could be a minimal amount. Why don't you be more specific? How did these warnings come about? Were they oral? Did they come over the radio? Typically, they come over the radio. No, no, I don't mean typically. How did they come in this case? What does the record show? The record shows in Trooper Nelson's declaration that he received information regarding officer safety concerns. It doesn't say specifically how he received them. Telepathy? I mean, I'm just sort of wondering. The Trooper Cyr, the record establishes, was familiar with Mr. Winterowd, and he says in his declaration, I'm familiar with the officer safety concerns. He called in and asked for someone else to pull Mr. Winterowd over since he had a suspect in the car. Okay, and if he says he's familiar, did he tell us what those concerns were? There's no information about the specific concerns. So he was there, he gave a declaration on the oath, but he chose to keep to himself what these concerns were. I am a little baffled. Or the concerns just aren't specific. The question in the case is how- I'm having a little difficulty understanding what non-specific concerns are. Is this sort of like that Monty Python song, I'm worried, you know, where the luggage retrieval system appeals to them, just general worries? General worries- Does it sound like a douche mother or something? I don't know. I shouldn't say non-specific because they were specific to Mr. Winterowd. What exactly were they? I'm having trouble understanding. I understand you're operating kind of in a- Is it, you know, this guy as known as a bank robber? Is it concern that he's attacked officers before? Is it the concern that he shows disrespect to officers? Is it that, you know, he has made obscene hand gestures to officers? I mean, you know, has he been reported to beat his wife or to molest children? I mean, is he sort of a guy who starts tsunamis or, you know, tries to do fusion in his bathtub experiments? In some respects, it would be more helpful to the officers if they had specific concerns like that. But in this case, the information is that they were generalized, which necessarily makes them rendering in a hazy area as they approach the scene. They need to follow procedures. Well, we are hazy, but they're not hazy. They know what's in their minds. What they haven't done is to tell us. Well, the question is, to be answered, we can look at this in hindsight and say, well, we wish we knew more specifically, but we have to look at it from the point of view of the reasonable officers at the scene. The Fourth Amendment directs us to do that. But doesn't the law – What it actually said was, offers the safety issues relating, I believe, to a hostile attitude toward law enforcement officers, insofar as that indicates anything. It indicates that all they really knew about him is that he had a hostile attitude toward police officers, not that he'd ever done anything. That's what Trooper – that's how Trooper Nelson interpreted it. Again, that's relevant, but the question is how would a reasonable officer interpret it? Well, let's back up a minute. Doesn't the law require that the officers must articulate the reasons why they have a concern for their safety prior to conducting a pat-down frisk of anybody? They can't just articulate a general concern that people in the world may pose a danger to them. We know that. But the law says there has to be something more, and the officer has to be able to say why. And the problem we're struggling with here is where in the record do we find those reasons articulated? As I understand it, there were two sources of information. One was there was some sort of a computer alert in the Alaska State Trooper's computer system that flagged Mr. Winterrod's name as posing some sort of potential danger. What does the record tell us about what the computer reported? No more than I've already said. All right. But let me ask you the next question. The second source of information, as I understand it, comes from other troopers who were familiar with Mr. Winterrod, presumably because they'd handled him before, right? They stopped him. Correct. What in the record tell us about what they knew from their prior contacts with Mr. Winterrod? That he posed an officer safety concern. How? By doing what? It's not specific. And the question to ask is, is it Trooper Nelson's fault that he didn't have specific warnings? No. And in terms of whether he's justified in doing an officer safety pat-down, I think that's been answered by the Supreme Court in multiple cases, including the Terry case, that traffic stops alone justify a safety pat-down. In this case, you have- Every traffic stop? Traffic stops. If an individual is going to get into a vehicle with a trooper for an investigation, which is permissible, an officer safety pat-down is appropriate, yes. And in this particular case, you have an individual not only with the vehicle- I don't think you answered just Tom's question. Did you hear the question? Is it the question about what the other officers knew? No, he said in every traffic stop. Every traffic stop where you're going to be face-to-face with an individual, yes, would justify a pat-down. Well, I'm not aware of any traffic stops where the officer wouldn't be face-to-face. Are there traffic stops that you're aware of where the officer is not face-to-face with an individual? You know, if the individual is in the car, you're not necessarily going to be able to conduct a pat-down search, but a pat-down search is very minimally intrusive. I think you're avoiding the question here. Obviously, if an individual is in the car, you are face-to-face. You can't conduct a pat-down search, and if you're entitled to do a pat-down search, you're entitled to ask the individual to step out so you can pat him down. So the situation where the individual is not accessible for a pat-down search is really a trivial case, which doesn't change the issue or the question at all. Your position is that in every traffic stop, the officer, because he comes face-to-face with an individual, the officer can't pat down the individual. It could be an elderly nun. It could be a guy in a wheelchair vehicle. It could be a 16-year-old, 90-pound young girl. It doesn't matter if the officer comes face-to-face with an individual. Now, what is your authority for this? Well, Terry v. Ohio. What does Terry v. Ohio say? Have you read it lately? No. It's been a few days. You are in court. You're relying on authority from the Supreme Court. Do you recall the part of Terry v. Ohio that says that the officer has to have a reasonable concern for safety? Do you remember that part?  I asked you a question. Yes. And there is a concern for safety here. But the question we're asking is, is the officer entitled to do it in every traffic stop? And your answer is a famous question. It's yes. Yes, and every time an officer stops somebody for a traffic stop, that pat-down is justified. Absent any other knowledge, no matter who the individual is, no matter whether they have an apparent ability to carry out any threat, no matter whether the stop involves speeding or reckless driving or drunk driving or anything else, even if it's a parking violation, they're in a red zone and sitting behind the wheel and the officer says, I'm going to give you a ticket. In your view, they can do a pat-down. That's your answer. Yes. It is. It's the right answer, but it's certainly a complete answer. I think the question must also be answered is, what law clearly establishes that that is not allowed? And in these circumstances, with known officer safety concerns, yes, they're generalized. With an individual who is uncooperative at the scene, the trooper asks him at least seven times for his license and registration. He challenged officers. What does that buy you? So he doesn't give him the license and registration. He's uncooperative. What does cooperative mean? You know, this is a nice general term that officers usually use. Why does one have to be cooperative with the police? Does non-cooperativeness mean danger? I mean, one can be non-cooperative and nevertheless not pose a danger. You admit that possibility. Yes, but an officer also could be concerned for his safety. And this individual, in the context of the pat-down, also abruptly turned toward the police officer. The police officer himself says in the transcript, I was afraid for my life. And he stopped the turn with his forearm using minimal force for a matter of seconds. But he also says later on that he could have done the – had he known about the shoulder problem, he could have accomplished his safety concerns otherwise. That's true. He does say that. And had he known in advance before he indicated to the individual. But as to that issue, we have a determination by the district court that there is an issue of fact, and that's not reviewable. So there's the question of whether there's an issue of fact on whether or not there was – the order in which things happened is not a reviewable question on this qualified immunity appeal. Is that right? I think that's – Okay. So therefore, we have to operate on the premise at this point that there – in fact, he was informed before he forced Mr. Winterod's hand behind him that there was a shoulder problem. Yes, and the law is not clearly established on what – when a mere statement informing of a problem requires – I understand that. You began down the road to say that Officer Nelson didn't know that, and I'm saying we have to proceed on the premise that he did, that he was told it. Yes, there's a difference between knowing and being told. I understand that, that he was told it. Now I have another question about the record. The transcript – in the transcript, it is both – I know Mr. Winterod's right, but I believe he said that he was actually wearing the brace at the time. And as I understand your argument, it is that there was no visible reason to think that he had a shoulder problem, but apparently there was. No, I don't believe that's the inference the district court drew. She's indicated he had a brace on, but that's after she jumped out of the car, ran back flailing and yelling, and made that statement. But the courts had already been – that he had already turned on the officer, he was already – was being held down, and it – the fact that she had to tell the officer indicates that it wasn't visible. And Winterod then repeats the statement, also, I have a brace on. But the inference – I think you're arguing the jury, but – I mean, that certainly is one way of construing what happened. The district court construed it that way. He focuses on the mere statement. But that doesn't really matter at this juncture, does it? I mean, the record – the question is, is there an inference from the record that there might have been something visible? There might have been. I don't see that inference from this record. Assume there was something visible. Assume that we read the record differently than you do, and we were to determine – so an officer is there, and he sees that the individual is wearing a neck brace or an arm brace. You know, something like that. What do you do with that situation? I mean, the fact that distinguishes this case from all other cases, whether he has something visible or not, is the prior officer. Why don't you answer my question? And after that, we'll go into your hypothetical. Well, the law is clearly established. You understand what my question is? Yeah. When you have an objective sign of some problem that's so debilitating that you can't comply with whatever the officer is asking, how do you know? I mean, the officer sees a guy wearing a neck brace, let's say. I realize this is not a neck brace situation, but it's a very obvious thing. You've seen people who've had whiplash kind of injuries, and they wear a neck brace. How do you know? How bad the injuries are? They just have something that suggests that they have an injury. Is the officer to ignore them and say, well, look, I don't know how bad the injury is. I'm going to treat it as if it didn't exist, because he has some duty to avoid exacerbating the injury. How do you know is precisely the question, and the officers are operating in a gray area, in a hazy area between appropriate force and excessive force. Even if there's a visible indication that what he's saying is so, it doesn't matter. In this factual scenario, because of the officer's safety concerns, yes, it doesn't matter. And the officer said there's nothing. So if Mr. Winterrod comes out and his elbow is flopping the wrong way, he says, well, too bad, you know, I've got safety concerns. I can go ahead and yank on it anyway. His elbow wasn't flopping, and there's no objective science. Well, I understand. That's hypothetical. But depending on. Let's say it was. Let's say, you know, there it is. You know, obviously, this located. Obviously, obviously, the place. Let's see. Let's see. Let's just say, well, too bad. I've got safety concerns. If he turns on a police officer during a pat down, it won't matter what's happening to his elbow. The officer has to make a split second decision to subdue the individual. And it was an appropriate decision in this case. And and a reasonable mistake can be made even after he did that. And as I read the transcript, he is still he is holding his hands behind him. And Mr. Wintouras say, you're going to make me pass out. And of course, Wintouras says he's got a brace on it. And Wintouras says, God damn it, I got a fucking brace on it. And then he says, you're going to make me pass out. And he's still holding his hand behind him. At that point, he could have checked it. At that point, Mrs. Wintouras had jumped out of the vehicle. She's pushing officers. She's flailing. She's exasperated. And so therefore. But it's not her that he's using the force on his hand. But it's her that he has his back to at this point. He's holding an individual over a car. He doesn't know what's happening. He can't see. He doesn't know where she's armed. He doesn't know if Mr. Wintouras is armed. In fact, Mr. Wintouras did have an armed weapon. It was just in the vehicle. Trooper at the time didn't know that. It was forced for only a matter of seconds after that. A matter of seconds, which is undisputed in this record. Totally appropriate. I'm sure an Alaska jury will see it that way. You should be glad. Your client should be glad to go before a jury of the people who employ him and say, Look, I did the right thing here. This guy was a menace and his wife was a menace. And you, the good people of Anchorage, decide whether I acted reasonably. I don't have a problem with that. But that defeats the whole purpose of qualified immunity. The whole purpose is to prevent officers from having to face juries, from being dragged into litigation, for the deterrent effect that litigation has on behavior. And this is an important case in terms of we only have mere subjective statements. That's what the district court found. His focus was not on a brace and the reasonable inference. And Mr. Wintouras never argues he had a visible brace, not at any point in these proceedings. He did so. He said it several different times in this interaction with the trooper that she said and he said. And at one point he said, you can check. And he says, I got a fucking brace on it right now. Well, they don't care, Kim. And then she says, let go of his arms. He's not going to hurt you. And then they don't do it. Even the district court said that if the amount of force here, it would have been justified if it had been an immediate danger. But the generalized officer safety concerns aren't sufficient without any citation to a case whatsoever. We have found no decisions, published or unpublished, under those circumstances that inform officers that you may not rely on prior officer safety warnings to justify the minimal amount of force used here. Either bringing the arm back, requiring a pat down. Or to be helpful. That's not what the warning was. Because from the little we can tell from it, it appears, as I said before, from the, suppose the safety officer report, and this is what the indication is from the affidavit of the declaration, was based on Mr. Winteron's obvious tendency to interact with police by being uncooperative. And that's essentially what Mr. Nelson said. He believed it was related to a hostile attitude toward police law enforcement officers, which he certainly appears to have had. He wasn't cooperative with them. But was there any basis for the officer safety statement that had anything to do with an actual safety concern, as opposed to an attitude? Certainly hostility is a precursor to a safety issue with an individual. It can't be ruled out. I agree that it would be helpful if the warnings were more specific. It would be more helpful to the officer. But it just makes this all the more hazy. I think you've taken more than double your time. Thank you. I think we can understand your position. Thank you. Mr. Winteron. Court, I'm Ralph Kermit Winteron II. I'm an American citizen, citizen of the United States of America. Natural born native and citizen of the foreign state of Kansas, domiciled in New York. I have a certificate to prove my citizenship. And I'm not a citizen of the United States either, by the way. Absolutely. You have to prove it by inference, by mere birth certificates. Well, that's another issue. I could give you quite a dissertation on this. I think you're right. Let me give you just a brief rundown of what's going on. Because if I, in a way, did violate Terry v. Ohio because they got in my car. Mr. Winteron, you're not a lawyer, right? I'm sorry? You're not a lawyer. I'm not a lawyer. Thank you. Maybe you have a little advice that we lawyers learn. You heard about, you know, what we talked about to opposing counsel, right? Yeah. Okay. And if you think there's anything unclear about our understanding of the case, you should go ahead and make your case. But sometimes it's good to leave things lie if you think we do understand your case. I understand. Go right ahead. First of all, there was no probable cause. And I can give you a brief scenario of what this issue is because I'm aware that. Well, no probable cause to stop your crime. No probable cause. Well, you see, I attempted to get this adjudicated in a court. Mr. Winteron, you didn't have an Alaska license plate on your car. That's why you were. I tried to get it in the court, and they wouldn't take it to court. Does that have to do with the officer's reason for stopping you? Do you quote with the fact that the officer has a right to stop you if you don't have an Alaska license plate? Well, what that was about is what the issue was about is under the Alaska Statutes 4529, 505, if I registered the automobile, I would become a debtor in commerce, and it goes right up to. But that goes to your legal position in court. The question that I'm interested in is what was it about the facts of the stop of your car that constituted a lack of probable cause, where the officer could plainly see that you didn't display a valid Alaska license plate on your car? Well, when you give me due process of law, I go to court. They dismiss the case. No, that's not the question. The question is what is it about the facts of the stop of your car that would cause a reasonable police officer to believe he didn't have a reason to stop you? It's a very simple question, Mr. Wehner. They were attempting to force me to get registration for tax. Because the law says you've got to have an Alaska license plate. That's what I was just attempting to say is the problem is I chose not to surrender. I had tax on the car. I registered with the VIN number. But, Mr. Wehner, that's not the question. The question is would a reasonable police officer in Trooper Nelson's position believe that you were driving your vehicle without the proper Alaska license plate? I've met everyone. I've met everyone. People before. I've met, sir, I've met. Well, I'm sure that you know them all quite well, but that's not. Absolutely, because I know who they are not, and that's the issue. They are not executive officers of any of the several states. I understand that you challenged their very authority to allow friends and caregivers to drive mugged police cars, but that's not the question I'm asking. Not quite what you say, but. All right. Well, the question I'm asking you is what was it about the circumstances surrounding the stop of your car that would have led a reasonable police officer to conclude that he didn't have probable cause to stop you? The only issue that I followed Trooper Cyr from Fairbanks for probably 40 miles. Well, but he was transferring a prisoner, and he couldn't stop him, so he radioed to Trooper Nelson. Trooper cars, and they almost ran me off the road, by the way. I pulled over, and I've always been lawful, legal, and extremely peaceful. All right, except that for whatever reason, you weren't displaying an Alaska license plate on the car. Absolutely. You don't have that. No, absolutely. Okay, so what's wrong? What's wrong with a police officer stopping a car that does not display a license plate? He can stop it if he wants to. So he does have probable cause? He has probable cause, but the probable cause. Okay, now that we have the probable cause issue, let's move on to the next question, which is, in this civil rights action, you are alleging that he used excessive force after he stopped you, right? Absolutely. Okay, so why don't you talk to us about that? Okay, well, I never get out of an automobile, by the way, anymore. I have a video camera now to record everything. I never get out, and the only reason why I accidentally… Let's talk about what you did that day, not what you have done since. That's what I'm talking about. Okay. The only reason why I got out is because of my wife's safety, and that's in the transcript. So you stay in that car, and you keep those doors locked, because these people are dangerous. They are always the first oppressors. That's right in their uniform, the use of force continuum. Their object is to get me to submit. That's what it says. They're not peace officers. They're not public officers. They have no executive power. So I got out, understanding that they're going to try to get me to submit, and their get-out-of-jail card they use excessively is, I was in fear of my life. I've always been peaceful. Absolutely. Ever. Never. I never touch them. I never do anything. I'm walking. I get out of the car. Tell my wife to lock up. Don't get out of the car under any circumstances. I'm walking, and next thing I know, he wants to do a pat-down. So I started to turn, and next thing I know, I've got my arm behind me, and he did something to my knees because my feet, my weight went out in front of me, and I'm on the hood of the trooper car. And I'm trying to tell him to let go because I have a magnetic brace. I have baritis, which, by the way, did cure, so that type of stuff does work. Could the officer see that brace, or was it out of your pocket? No, he did not see it, but I was trying to tell him about it, and he wouldn't turn loose and then added me on that because they do not like because I have fundamental rights and I choose not to surrender. Absolutely. I'm not going to surrender my fundamental rights. In the case that I rely on, that is State v. Hawkins, 257P411. I know he has no office. He has no oath of office. That's in the transcript. He's not a public officer. They won't answer any of these questions. So I'm down there, and I'm trying to do something. What am I going to do? And I've had my hip broke, and this pain was like that. It just, you just, I don't know how to explain this. You've had something broke. You're just going to pass out. Being hit is not the same thing, and I'm trying to tell him. I'm not going to make this, folks, and he's sitting back there, because he's going to get even with me. In the meantime, I'm trying to get up because I can't stand this. I've done it. I ain't going to make this, folks, and when they finally turned me loose, I went through the ground. That's not in the transcript. I was right on the point of passing out, and I'm a big guy, and I don't pass out easy. I guarantee you, and he would let go of me. They got into my pockets. They took all my pens, pencils, everything. That's against Terry versus Ohio, and there was no probable cause to do this. Now, first of all, because I shouldn't have. Like I said, now I'd never get out for my own personal safety, because these are the things that happen, just like the Osborne case down here in Takena, where they shot a cripple guy, and I was in fear of my life. That is not to get out. I'm standing between three paramilitary. They are paramilitary. Eric Spitzer testified in a row. They're paramilitary, and they use the use of force continuum. The first level is officer present. Next level is military commands. Next is soft hand techniques. Then they go up to OC. They're military. They're not civil, and I'm aware of all these issues. I know they're extremely dangerous, so I don't even, when I'm rounded, I get around, I have them stand away at least 10 or 15 feet, because if I even touch them, or they can get close enough to touch me, here we are. I was doing nothing, absolutely. I was just peacefully walking back between three armed troopers. The officer says that you turned on him. He wanted to turn around, and what he did is he got ahold of my arm, and he said, I'm going to pat you. He grabbed, and I started to turn around. I can't. This arm couldn't go back. I had no choice, and I tried to inform him. I've got a shoulder. He grabbed my arm. He's walking behind me. So did you inform him about your arm before he grabbed it, or what happened? Oh, I did when he started to do that, and that's when he grabbed me, when he got ahold of my arm, I tried to tell him. And he wouldn't hear of it, and finally, my now ex-wife, because that was the straw, she's scared spitless of these folks. She should be. I am too, because I know what they're capable of doing. There was no safety issue. I have never, ever done anything. I've never pushed. I don't swear at him. I don't do anything. I did this because he had me down, and I was getting mad. What am I going to do? How do I get this guy to turn loose on me? He wouldn't do it, because I know he's a professional making citizens at risk. It's right under Russell Emanuel. He has no police power. He's just plain-Jane citizen. Actually, he's a citizen of the United States. He's less than I am, because he surrendered all of his fundamental rights to do what he's doing. I think we understand your position. I'm sorry? We understand your case. Thank you, Mr. Wendell. Well, the thing that is frustrating, I did several subpoenas. I tried to get him into depositions. I tried everything in the court. I said, if you want to write these tickets, that's what they would do. They would write tickets, haul me out to jail, turn me loose. This, they stole the car, my pickup, my private transportation. And then they just brought charges again. I said, you know, at some point, this has got to cease, folks. If you guys, if these troopers think that they have probable cause, why won't you come to court? You know, that's a good question, and a good question to end on. And I have never been able to get one of them in there. Your time is up. Okay. Thank you. Case decided. You will stand submitted. The next here argument in Gillian v. Barton. Thank you.
judges: Kozinski, Berzon, Tallman